UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 1:22-cv-20238

UNITED STATES OF AMERICA,

        Plaintiff,

v.                                       **JURY TRIAL DEMANDED**

THE PROMISSORY NOTE WITH A PRINCIPAL
AMOUNT OF $5.7 MILLION EXECUTED ON
DECEMBER 19, 2019 BY 8787 RICCHI LLC
PAYABLE TO 87STE LENDING LLC, THE
RELATED DEED OF TRUST SECURING THE
NOTE RECORDED ON DECEMBER 23, 2019, AS
WELL AS ANY MODIFICATIONS THERETO, ANY
OTHER INDEBTEDNESS SECURED BY THE SAME
DEED OF TRUST, AND ALL RIGHTS AND
REMEDIES AVAILABLE UNDER BOTH THE
NOTE AND DEED OF TRUST,

        Defendant.

_____/

## VERIFIED COMPLAINT FOR FORFEITURE IN REM

The United States of America, in accordance with Rule G of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions, brings this complaint for forfeiture *in rem* and alleges the following:

### NATURE OF THE ACTION

1.     This is a civil action *in rem* to forfeit assets that facilitated, were involved in, and are traceable to an international conspiracy to launder money embezzled and fraudulently obtained from PrivatBank.

2.     Those funds were used to purchase, maintain, and improve property in the United States. The profits from those acquisitions, which constituted proceeds of the embezzlement and fraud from PrivatBank, were used, among other ways, to improve and maintain real property located at 8777 and 8787 North Stemmons Freeway in Dallas, Texas (the "Stemmons Towers"), which Optima purchased in 2008. The complex was sold by

Optima in December 2019 to 8787 Ricchi LLC for approximately $6.5 million, which was financed in part by a seller's loan in the principal amount of $5.7 million.[1]  The promissory note representing that loan, as well as the deed of trust securing it, and all rights under the same, constitute the Defendant Asset, as defined more fully in ¶ 9, *infra*.

3.      The United States seeks forfeiture of the Defendant Asset pursuant to 18 U.S.C. § 981(a)(1)(C), because the Defendant Asset is traceable to violations of U.S. law and specified unlawful activity, including violations of 18 U.S.C. §§ 1956, 1957, 2314, and 2315.

4.      The United States also seeks forfeiture of the Defendant Asset pursuant to 18 U.S.C. § 981(a)(1)(A), because the Defendant Asset was involved in one or more money laundering offenses in violation of 18 U.S.C. §§ 1956 and 1957.

5.      The specified unlawful activity includes fraud by or against a foreign bank (18 U.S.C. § 1956(c)(7)(B)(iii)); the transportation, receipt, concealment, possession, sale, and disposal of misappropriated[2] money in foreign commerce (18 U.S.C. §§ 2314 and 2315); and conspiracy to commit those actions.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1345 and 1355.

7.      Venue lies in this district pursuant to 28 U.S.C. §§ 1355(b)(1)(A), because acts and omissions giving rise to the forfeiture took place in the Southern District of Florida. Those include, but are not limited to, entities involved in the criminal activity having a principal place of business in Miami, those entities conducting business in Miami, entities and individuals using Miami addresses to conduct the criminal activity, and the purchase of property involved in the money laundering scheme occurring in Miami.

## PEOPLE AND ENTITIES

8.      The Plaintiff is the United States of America.

---

[1]      Neither 8787 Ricchi LLC nor its owners or managers are alleged to be implicated in any wrongdoing described herein; 8787 Ricchi was simply a third-party purchaser of the property.

[2]      For ease of reference, the term "misappropriation" is used throughout this complaint to refer to embezzlement, conversion, and fraud committed against PrivatBank.

9.      The Defendant Asset is (i) the Promissory Note with a principal amount of $5.7 million executed on December 19, 2019 by 8787 Ricchi LLC payable to 87STE Lending LLC (the "Promissory Note" or "Note"), (ii) the related Deed of Trust, Security Agreement, Assignment of Leases and Rents, and Fixture Filing ("Deed of Trust") securing the Note recorded on December 23, 2019, as well as any modifications thereto, (iii) any other indebtedness secured by the same Deed of Trust, and (iv) all rights and remedies available under both the Note and the Deed of Trust, including all payments of interest, principal, and fees due under the Note.

10.     PrivatBank is a Ukrainian financial institution located in Ukraine, with a branch in Cyprus and an affiliated entity in Latvia, among other places.  PrivatBank is one of the largest banks in Ukraine.  From 2003 to 2016, it accounted for approximately 25% of the banking sector in the country, and held deposits in excess of $6 billion, which comprised approximately 33% of individual deposit accounts in Ukraine.  Extensive audits by the National Bank of Ukraine ("NBU") in 2016 uncovered a scheme by the bank's owners to steal over $5 billion from the bank via the issuance of fraudulent loans.  As a result of the massive theft and fraud, PrivatBank was nationalized in December 2016.

11.     Ihor Kolomoisky is a billionaire Ukrainian oligarch.  He controls businesses in many sectors of the Ukrainian economy, including metals, energy, and media, under the umbrella of the "Privat Group."  Before the nationalization of PrivatBank, he was one of the two primary owners of the bank and was a member of the bank's Supervisory Board.  He exercised extensive control over the bank and its activities.  Kolomoisky was also the governor of Dnipropetrovsk province in Ukraine from 2014 to 2015.

12.     Gennadiy Boholiubov is another Ukrainian oligarch who shares in the ownership of many business entities with Kolomoisky under the Privat Group.  He was the second major shareholder of PrivatBank along with Kolomoisky and was a member of PrivatBank's Supervisory Board.  He, together with Kolomoisky, exercised extensive control over the bank and its activities.

13.     Mordechai Korf, also known as "Motti," is a Miami-based business associate of Kolomoisky and Boholiubov.  He helped to acquire and manage the Ukrainian oligarchs' business empire in the United States.  Along with Kolomoisky and Boholiubov, Korf was a part owner of dozens of U.S. entities, for which he often acted as President and CEO.  The

companies owned and controlled by Korf generally share variations of the name "Optima." Korf was also a part owner of PrivatBank's Latvia affiliate.

14.     Uriel Laber is another Miami-based associate of Kolomoisky and Boholiubov, and is Korf's business partner.  He worked with Korf to acquire and manage U.S.-based entities for Kolomoisky and Boholiubov under the "Optima" umbrella of companies.  Laber also serves on the supervisory board of Ukrnafta, a Ukrainian oil and gas company, in which Privat Group has a significant share.  Like Korf, Laber was a part owner of PrivatBank's Latvia affiliate.

15.     The interests of Mordechai Korf, Uriel Laber, Ihor Kolomoisky, Gennadiy Boholiubov, Optima Stemmons LLC, Optima Ventures LLC, and 87STE Lending LLC may be adversely affected by these proceedings.

## FACTUAL ALLEGATIONS

16.     Beginning in at least 2008, Ihor Kolomoisky and Gennadiy Boholiubov used their control of PrivatBank to steal billions of dollars of the bank's funds.  The magnitude of the fraud and theft was so great that NBU was forced to bail out the bank by providing $5.5 billion in order to stave off economic crisis for the whole country.

17.     The idea was simple: Kolomoisky and Boholiubov requested money from PrivatBank, which (based on their control and ownership) they always received, and rarely paid it back, except by taking out additional loans from PrivatBank.

18.     The mechanics of the scheme were complex.  Kolomoisky and Boholiubov used a substantial collection of companies they owned or controlled to apply for loans from PrivatBank. An army of functionaries at PrivatBank then papered and processed the loans as if they were legitimate.  A "special" credit committee at the bank approved the loans, despite misrepresentations in the applications.  The loan proceeds were then divided, combined, and transferred through a vast network of companies, generally using accounts at PrivatBank's Cyprus branch, to disguise their nature, source, ownership, and control.  Eventually, the money was sent all over the world.  When the loans came due, other loans were often used to pay off the old loans, or, in some cases, they were repaid with income from the use of the misappropriated funds.

19.     Kolomoisky and Boholiubov further laundered the money by purchasing assets in the United States.  They enlisted Mordechai Korf and Uriel Laber, who had previously run

businesses in Ukraine and the U.S., for that purpose.  Korf and Laber established a network of companies, generally under some variation of the name "Optima," to acquire businesses and real estate in the U.S. using the misappropriated money from PrivatBank.

20.     Using Korf and Laber's network, Kolomoisky and Boholiubov spent prolifically: they purchased more than five million square feet of commercial real estate in Ohio, steel plants in Kentucky, West Virginia, and Michigan, a former cellphone manufacturing plant in Illinois, and commercial real estate in Texas.

21.     In 2008, they purchased Stemmons Towers in Dallas, Texas.  Over the next decade, they used money traceable to funds embezzled and fraudulently obtained from PrivatBank to maintain and improve Stemmons Towers, and therefore used Stemmons Towers to further launder the funds and to promote and facilitate the scheme.

I.     **Kolomoisky And Boholiubov Stole Billions From PrivatBank**

A.     **Kolomoisky and Boholiubov Controlled PrivatBank.**

22.     Kolomoisky and Boholiubov founded PrivatBank in 1992.  By 2008, and through 2016, each owned roughly 45% of the bank.

23.     Kolomoisky and Boholiubov exercised control over PrivatBank as its majority shareholders.  The "general meeting" of shareholders was the highest decision-making authority of PrivatBank, and Kolomoisky and Boholiubov controlled approximately 90% of the "votes."  Through that authority, they could, among many other things, appoint and remove members of the Supervisory Board and the Audit Committee, and change the bank's bylaws.

24.     Kolomoisky and Boholiubov also exercised control through their domination of PrivatBank's Supervisory Board.  From at least 2010 to mid-2015, Kolomoisky and Boholiubov were two of the three members of the Supervisory Board, and Boholiubov was the Chairman.  That gave them unchecked power over the Board's decisions.[3]

25.     The Supervisory Board was tasked with the selection and removal of members of PrivatBank's management.  Kolomoisky and Boholiubov used that authority to install their

---

[3]     In late 2015, as discussions with NBU began, and nationalization became a possibility, additional members were added to the Supervisory Board.  Yet Kolomoisky and Boholiubov continued to control the Supervisory Board and the bank—as majority shareholders, they had the power to appoint and remove members of the Supervisory Board.

lieutenants in key roles at PrivatBank—particularly in positions that controlled disbursement of the bank's money.  One of those individuals was Manager 1.  Another was Manager 2, who was frequently referred to as "Kolomoisky's Treasurer" or his right-hand man.  Manager 2 served as the Head of PrivatBank's Investment Business and as First Deputy Chairman of PrivatBank's Management Board from 2002 until December 2016.  In those positions, he acted at the direction of, and for the benefit of, Kolomoisky and Boholiubov.

26.     The Supervisory Board also had the responsibility to approve high-value loans and was obligated to protect the bank's interests.  Contrary to those interests, the Board routinely signed off on loan applications to entities owned and controlled by Kolomoisky and Boholiubov.

27.     The Supervisory Board was further charged with selecting the bank's auditor and determining the agenda for audits.  It thus fell to Kolomoisky and Boholiubov, and their hand-selected subordinates, to ensure that the bank complied with Ukrainian law and that no one was pilfering its resources.

28.     Kolomoisky and Boholiubov had a reputation in Ukraine that led employees of PrivatBank to follow orders.  Kolomoisky in particular was known for ruthlessness and even violence that inspired this loyalty—while he was governor of Dnipropetrovsk province, he was known to have paid armed goons to take over the offices of a state-owned oil company.  The employees of the bank understood that management's instructions were Kolomoisky and Boholiubov's orders, and orders were followed.

29.     Employees understood that if they did express dissent, they would lose their bonuses, have work taken away, or simply be fired.  Those consequences were particularly harsh in context, as PrivatBank offered some of the highest paying jobs in the region.

30.     During the nationalization process in 2016, NBU and its representatives dealt primarily with Kolomoisky and Boholiubov in negotiating the terms of the agreement.  NBU and others understood that Kolomoisky and Boholiubov were in control of the bank.

**B.     Kolomoisky and Boholiubov Embezzled Money and Defrauded the Bank.**

31.     Despite having significant wealth, Kolomoisky and Boholiubov devised a scheme to take the bank's funds—money entrusted to it by ordinary depositors—for themselves.

32.     To that end, they converted a department within PrivatBank to service accounts for them and their companies.  The department was called "BOK," or "Business Client Management," and was headed by Manager 1.

33.     Kolomoisky and Boholiubov, with the assistance of Manager 1, Manager 2, and others, caused PrivatBank (via BOK) to issue billions of dollars in loans to companies they owned or controlled ("related parties").  The related parties included, among others, Zaporozhye Ferroalloy Plant ("ZFZ"), Nikopol Ferroalloy Plant ("NZF"), and Ordzhonikidze Mining & Processing Plant ("OGZK"), all of which were owned by Kolomoisky and Boholiubov.

34.     Loan applications totaling more than $126 million were submitted under NZF's name in 2010 alone.

35.     During the same period, loan applications totaling more than $21 million were submitted under ZFZ's name.

36.     And in 2010 and 2011, loan applications totaling approximately $90 million dollars were submitted under OGZK's name.

37.     All three entities received hundreds of millions of dollars under the lines of credit and loans that had been granted based on those applications.

38.     Kolomoisky and Boholiubov also caused hundreds of millions of dollars in loans to be issued to entities they owned that conducted little or no business at all, and which effectively existed only to steal from PrivatBank and launder the misappropriated funds.

39.     By the time the bank was nationalized in 2016, approximately 97% of the corporate loans outstanding were to businesses owned or controlled by Kolomoisky and Boholiubov.

40.     Unlike the other 3% of loans, the related parties' loan applications and files were prepared by PrivatBank employees working as part of BOK, a separate department of the bank.

41.     The loan applications were almost always fraudulent.  The most glaring misrepresentation was the stated "purpose" of the loan.  Loan applications included a section requiring the applicant to describe the loan's purpose.  The applications submitted by the related parties generally claimed that the purpose was to fund ongoing operations of the business entity applying for the loan.  Instead, the money was sent wherever Kolomoisky and

Boholiubov wanted, and was often used *by a completely different entity*, for whatever purpose they devised. Those misrepresentations were material: the loan agreements stated that the loans must be used for the purpose stated in the application.

42.     For instance, the application for Loan No. 4Z1195D for $14,850,500 stated that the loan's purpose was "funding ongoing operations" of ZFZ, which produced ferroalloys in Ukraine. Instead, a significant portion of the loan was used by Pavanti Enterprises Limited ("Pavanti"), a Kolomoisky-owned entity with an account at PrivatBank Cyprus, to purchase a commercial building in downtown Cleveland, Ohio.

43.     Other examples of misrepresentations related to the purpose of the loan include:

| Loan No. | Amount | Misrepresentation of the Loan's Purpose |
|----------|--------|------------------------------------------|
| CY001I/4 | $20,000,000 | The stated purpose of the loan was "the replenishment of floating assets . . . including, for manganese ore;" instead, the funds were used to purchase Kentucky Electric Steel, a steel plant in Kentucky. |
| 4N1212D | $12,000,000 | The stated purpose of the loan was "[f]unding ongoing operations" related to the production of ferroalloys in Ukraine; instead, the funds were used to purchase One Cleveland Center, a commercial high rise in Cleveland, Ohio. |
| 4N09128D | $14,000,000 | The stated purpose of the loan was "[f]inancing current activities" related to the production of ferroalloys in Ukraine; instead, a portion of the funds were sent to Korf and Laber's personal accounts in the United States. |
| 4A1531D | $60,000,000 | The stated purpose of the loan was "[f]unding ongoing operations" related to wholesale and retail trade; instead, a portion of the funds was used to purchase a former cell phone manufacturing facility in Harvard, Illinois. |

44.     Those misrepresentations constituted a fraud by and on PrivatBank. PrivatBank was put at serious financial risk and was harmed because of those lies, which violated Ukrainian law and PrivatBank's internal policies.

45.     The applications contained additional misrepresentations. Generally, they stated that the loans would be repaid with income earned through current business activities. Instead, in many instances, the loans were repaid with the proceeds of other loans.

46.     Again, there are numerous examples of that fraudulent activity, which include:

| Loan No. | Amount | Misrepresentation of the Source of Repayment |
|----------|--------|----------------------------------------------|
| 4N09129D | $14,000,000 | The loan application stated that the loan would be repaid via funds earned through ferroalloy production; instead, it was repaid with funds from other loans. |
| 4D09111I | 500,000,000 Ukrainian Hryvnia ("UAH")[4] | The loan application stated that the loan would be repaid via funds earned through ongoing operations; instead, it was repaid with funds from two loans to other related parties. |

47. Those misrepresentations constituted a fraud by and on PrivatBank. The source of loan repayment was material as a part of the bank's risk assessment. Although on paper certain loans were paid when they came due, in reality, they were being paid through the issuance of additional debt, and so PrivatBank was simply recycling the loans and increasing its losses.

48. Additionally, the loan applications contained misrepresentations related to the collateral securing the loan. Like the source of loan repayment, the nature and value of collateral was material to the bank's decision to issue a loan.

49. For example, the application for Loan No. CY001I/4 for $20 million by Veroni Alloys LLC ("Veroni"), a Kolomoisky-controlled entity, referenced collateral in the form of the goods to be traded based on contracts between Veroni and Halefield Holdings Limited ("Halefield"), another shell company owned and controlled by Kolomoisky and Boholiubov. The contract provided that Veroni would purchase $122,500,000 of Australian manganese ore from Halefield and sell it to Hangli International Holdings Limited ("Hangli"), another shell entity controlled by Kolomoisky and Boholiubov. No such purchases or sales of Australian manganese occurred.

50. Frequently, the "loans" taken by Kolomoisky and Boholiubov's entities were lines of credit—a source of funds that could be drawn on whenever convenient. The lines of credit, by their terms, were supposed to be used to fund ongoing business of the entities that received them. However, they functioned instead as slush funds—a big pot of money that Kolomoisky and Boholiubov drew on for whatever purpose they wanted, and often used to send cash to the United States for asset purchases by unrelated entities.

---

[4] Eight months after the loan was issued, the loan amount was increased to 750,000,000 UAH, or approximately $92 million at the 2009 exchange rate.

51.     For instance, Loan No. 4Z10330D was a line of credit for $9,300,000 to ZFZ, an entity owned by Kolomoisky and Boholiubov.  Between December 2010 and December 2011, ZFZ debited over $19.9 million against the line of credit.

52.     As discussed above, Kolomoisky and Boholiubov often repaid the lines of credit by taking out additional loans.  In the case of Loan No. 4Z10330D, nearly $8 million of the repayment came from other loan proceeds from PrivatBank.

53.     When Kolomoisky and Boholiubov's entities applied for those "second tier" loans, they did not disclose that they would use them to pay back prior loans.  PrivatBank was never made whole—it simply kept lending more money to pay back old loans, which eventually led to the more than $5 billion shortfall.

54.     At PrivatBank, there were two different committees that reviewed loan applications.  There was an "active credit committee," which was responsible for consumer credit.  The members of the committee met in person, deliberated about the bank's lending activity, and considered PrivatBank's written policies.  They required documentation and conducted inquiries before issuing loans.

55.     Kolomoisky and Boholiubov went to a different credit committee to get their loans approved.  That was a "remote" or "electronic" credit committee, which reviewed applications for related party loans.  The committee did not meet in person to discuss the loans; rather, it held electronic "meetings" via a system called PrivatDoc.

56.     The "electronic" committee consisted of certain PrivatBank employees who were otherwise entirely uninvolved in the loan approval process.  Those employees understood that their role was simply to "sign" the loan electronically.  Rather than conducting a thorough inquiry, members of the electronic credit committee simply hit "approve" whenever they received a loan application from one of Kolomoisky or Boholiubov's companies.  They conducted no analysis or evaluation of the loans or associated documents as required by bank policy, and they were expected not to do so.

57.     That lack of review is thrown into particularly sharp relief by the treatment of collateral for loans to Kolomoisky and Boholiubov's entities.  In multiple instances, PrivatBank employees noted that additional work was needed to verify the collateral, and yet the loan was approved the very same day, without further investigation or amendment.

58.     Examples of the electronic credit committee disregarding collateral requirements for loans for Kolomoisky and Boholiubov's entities, which would have been applied by the regular credit committee, include:

| Loan No. | Amount | Disregarding Collateral |
|---|---|---|
| 4N09129D | $14,000,000 | Internal paperwork noted that collateral had not been provided for the loan; nevertheless, the loan was approved that same day and signed by Boholiubov as chairman of the Supervisory Board. |
| 4A1532D | $46,500,000 | Internal paperwork noted that further information was needed; nevertheless, the loan was approved that same day. |
| 4O10091D | $50,000,000 | Internal paperwork noted that work was underway to increase collateral; nevertheless, the loan was approved that same day. |
| 4N11415D | $13,500,000 | Internal paperwork noted that work was underway to increase collateral; nevertheless, the loan was approved that same day. |

59.     The dual approach—one for entities owned and controlled by Kolomoisky and Boholiubov, and one for most everyone else—was also evident in the loan packages. While legitimate loan packages might contain "a huge book" of documents analyzing collateral for a loan, the package for multi-million-dollar loans to Kolomoisky and Boholiubov's entities might have as little as "just one page."

60.     Kolomoisky and Boholiubov's misappropriation of the bank's funds constituted embezzlement and conversion.  The funds had been entrusted to the bank by ordinary depositors and legitimate businesses; Kolomoisky and Boholiubov siphoned them off and never expected to pay the money back.[5]

61.     Kolomoisky and Boholiubov's misappropriation of the bank's funds also constituted a fraud on the bank.  The many material misrepresentations allowed them to take the money to use as they wanted, without restriction, and hid the misuse of funds from regulators, depositors, auditors, and others.

62.     Kolomoisky and Boholiubov's misappropriation of the bank's funds also constituted a fraud by the bank, because the bank gave funds entrusted to it to Kolomoisky and Boholiubov's entities, putting the depositors at great risk and misusing their money.

---

[5]     In fact, just before the bank was nationalized, loans to entities owned or controlled by Kolomoisky and Boholiubov were restructured, effectively delaying their obligation to repay outstanding debt for almost another decade.

63.     As described below, the misappropriated funds were transferred from Ukraine into Cyprus and ultimately into the United States, where it was transferred between states to acquire, maintain, and improve various properties.

**C.     Kolomoisky and Boholiubov's Actions Violated Ukrainian Law.**

64.     Kolomoisky and Boholiubov's conduct violated numerous provisions of the Ukrainian Criminal Code, including the following:

65.     Article 190, which prohibits "Taking possession of somebody else's property or obtaining the property title by deceit or breach of confidence (fraud)."

66.     Article 191, which prohibits "Misappropriation, embezzlement or conversion of property by abuse of office."

67.     Article 209, which prohibits laundering the proceeds of a crime.

68.     Article 218-1, which makes it illegal to drive a bank into insolvency.

69.     Article 219, which makes it illegal to drive a business entity into insolvency.

70.     Article 220-2, which prohibits the falsification of financial documents and reports of a financial organization.

71.     Article 222, which prohibits fraud with financial resources.

72.     Article 364-1, which prohibits the abuse of power by an official of a private legal entity.

**D.     Kolomoisky and Boholiubov Laundered the Loan Proceeds.**

73.     Once the loan or line of credit funds were disbursed, they were quickly combined, divided, and commingled in a labyrinth of accounts all over the world.  The dizzying series of transfers was designed to disguise the nature, location, source, ownership, and control of the fraudulently obtained loan proceeds.

74.     The entities used to transfer the funds were often shell companies—they did no business and had no offices or employees; they existed only to disguise money by shuttling it from place to place.

75.     Many of the shell companies used the same address.  For instance, in "Know Your Customer" records provided to PrivatBank, at least 56 separate entities claimed to be located at Archiepiskopou Makariou Ill Avenue, 155 Proteas House in Limassol, Cyprus. They also used the same few registered agents repeatedly: Icaza, Gonzalez Ruiz & Aleman (BVI) Trust Limited was listed as the registered agent for 21 separate shell entities, and Equity

Management & Accountancy Corp was listed as the registered agent for 16 shell entities. The same two authorized signers (neither of whom was Kolomoisky or Boholiubov) together appear for 48 different shells entities.

76.     In the same records, Kolomoisky and Boholiubov were listed as the beneficial owners of 35 shell entities that were used to transfer money misappropriated from PrivatBank. At least 96 entities used in those transactions shared a secretary, director, signer, registered agent, shareholder, or address with one of the entities overtly owned by Kolomoisky and Boholiubov, and many shared multiple individuals in common.

77.     PrivatBank employees were directed to act as officers and directors of many of those shell companies and were instructed by their PrivatBank supervisors to sign documentation to that effect. At least 59 different shell entities listed PrivatBank employees in such roles. However, those employees were not bona fide officers and directors—they exercised no duties and responsibilities of officers and directors of the companies, which were empty shells.

78.     Once the funds were taken from PrivatBank, they were transferred quickly among dozens of accounts held in the names of shell entities at PrivatBank's Cyprus branch. Multiple transfers often occurred within minutes.

79.     NBU conducted a review of PrivatBank's Cyprus branch as part of its investigation and determined that it was an instrument used to launder money for Kolomoisky and Boholiubov. NBU found that the branch's assets were overwhelmingly fictional; that the branch's loan portfolio consisted almost exclusively of oversize loans to entities owned and controlled by Kolomoisky and Boholiubov; that the collateral provided was insufficient and did not meet regulatory requirements; and that the purpose of the loans issued by the branch was to hide the ultimate beneficiaries and the source of funds. NBU also determined that the management of PrivatBank's Cyprus branch was controlled by PrivatBank in Ukraine—in other words, by Kolomoisky and Boholiubov.

80.     One example of the Cyprus branch's role in laundering the misappropriated funds is the cycling of the funds disbursed as Loan No. CY001I/4 to Veroni. On February 4, 2013, $20 million from the loan was disbursed into Veroni's account at PrivatBank's Cyprus branch. As with the other loans, its purpose and use were misrepresented to the bank. The purpose was listed as "replenishment of floating assets for payments according to contracts,

13

including for manganese ore." Instead, the funds went to purchase a steel plant in Kentucky. But before the money was transferred to the United States, the loan proceeds were deposited and then withdrawn from the accounts of 13 different shell entities in a total of 17 transactions at PrivatBank's Cyprus branch—all in only 8 minutes. The transactions served no business purpose; they were designed entirely to hide the source and nature of the funds.

## II. Korf And Laber Created A Vast Network Of Companies To Launder The Stolen Money And Spend It In The United States

81.     The laundering did not stop in Cyprus. Kolomoisky and Boholiubov recruited their American counterparts, Korf and Laber, for the next step. Korf and Laber established a complex system of entities in order to facilitate the laundering of the misappropriated funds, and to spend the funds to acquire property and businesses in the United States.

82.     The companies often used a variation of the name "Optima"—Optima Ventures, Optima Group, etc. The "Optima Family" of companies had a convoluted ownership structure that constantly shifted as new entities were created to move money, disguise ownership of assets, and otherwise launder funds.

83.     The Optima Family included (among many others) the following entities, which were created, owned[6], or managed by Korf and Laber:

a.      Optima International of Miami, Inc. ("Optima International") was founded by Korf and Laber in 1995. Korf and Laber were the initial owners, and they sold shares of Optima International and its subsidiaries to entities owned or controlled by Kolomoisky.

b.      Optima Group, LLC ("Optima Group") was incorporated on August 8, 2008 in Delaware. It is owned by Kolomoisky, Boholiubov, Korf, and Laber. Korf had authority to direct Optima Group's funds but discussed those decisions with both Kolomoisky and Boholiubov.

c.      Optima Ventures LLC ("Optima Ventures") was incorporated on January 1, 2008 in Delaware. Optima Ventures was owned by Kolomoisky, Boholiubov, Korf, and Laber. It was the primary vehicle used to acquire property in

---

[6]      Throughout ¶ 83 and its subsections, "owned" means "ultimately beneficially owned." Kolomoisky, Boholiubov, Korf, and Laber "owned" entities both directly and indirectly, through a collection of other entities.

the United States with misappropriated funds from PrivatBank. Through that activity, it became the largest holder of commercial real estate in Cleveland, Ohio. Korf and Laber established many entities under Optima Ventures to acquire properties, including:

i.      Optima 55 Public Square, LLC ("Optima 55 Public Square"), used to acquire the building at 55 Public Square in Cleveland, Ohio.[7]

ii.     Optima One Cleveland Center, LLC, used to acquire the building at One Cleveland Center in Cleveland, Ohio.

iii.    Optima 1375, LLC, used to transfer ownership of One Cleveland Center in 2010.

iv.     Optima 1300, LLC, used to acquire the AECOM Building in Cleveland, Ohio.

v.      Optima 777, LLC, used to acquire the Crowne Plaza Hotel (now known as the Westin Hotel) in Cleveland, Ohio.

vi.     Optima Stemmons, LLC ("Optima Stemmons"), used, as discussed in detail below, to acquire Stemmons Towers at 8777 and 8787 North Stemmons Freeway in Dallas, Texas.

vii.    Optima 7171, LLC, used to acquire the CompuCom Campus located at 7505 and 7171 Forest Lane in Dallas, Texas.[8]

viii.   Optima 500, LLC, used to acquire the PNC Plaza building at 500 West Jefferson Street in Louisville, Kentucky.[9]

ix.     Optima 925, LLC, used to acquire the Huntington Building at 925 Euclid Avenue in Cleveland, Ohio.

d.      Georgian American Alloys, Inc. ("Georgian American Alloys") was incorporated on February 14, 2012 in Delaware. Georgian American Alloys was

---

[7]      This property is the subject of a civil forfeiture complaint in this District, No. 20-cv-25313-MGC.

[8]      This property is the subject of a civil forfeiture complaint in this District, No. 20-cv-23278-MGC.

[9]      This property is the subject of a civil forfeiture complaint in this District, No. 20-cv-23279-MGC.

owned by Kolomoisky, Boholiubov, Korf, Laber, and one of their business associates. Approximately 35% of their ownership was through Optima Group. Georgian American Alloys was the umbrella under which Kolomoisky, Boholiubov, Korf, and Laber owned and managed several ferroalloys producers and traders in the United States:

   i.  CC Metals and Alloys LLC, a Delaware company with a ferroalloy plant in Calvert City, Kentucky.

   ii.  Georgian American Alloys Sarl, a Luxembourg entity.

   iii.  Felman Production, LLC ("Felman Production"), a Delaware company with a ferroalloy plant in New Haven, West Virginia. Felman Production had a bank account at PrivatBank's Cyprus branch, received loans from PrivatBank, and transferred over $225 million to and from entities owned and controlled by Kolomoisky and Boholiubov from 2008 to 2014.

   iv.  Felman Trading Inc., a New Jersey company and global supplier of manganese and ferroalloys.

  e.  Optima Acquisitions, LLC ("Optima Acquisitions") was incorporated on June 25, 2008 in Delaware. Optima Acquisitions is owned in thirds by Kolomoisky, Boholiubov, and Korf, and was used to acquire companies in the United States using money misappropriated from PrivatBank, including Optima Specialty Steel, Inc. and Steel Rolling Holdings, Inc.

  f.  Optima Specialty Steel, Inc. ("Optima Specialty") was a wholly owned subsidiary of Optima Acquisitions created in 2008. Using Optima Specialty and funds misappropriated from PrivatBank, Korf and Laber acquired or created Michigan Seamless Tube LLC, Niagara LaSalle Corporation, KES Acquisition Company d/b/a Kentucky Electric Steel, and Corey Steel Company.

  g.  Warren Steel Holdings, LLC ("Warren Steel") was incorporated on November 19, 2001 in Delaware. Warren Steel is owned by Kolomoisky and Boholiubov and one of their former business partners. Warren Steel ran a steel mill in Warren, Ohio and was managed by Korf.

  h.  Optima 1375 II, LLC ("Optima 1375 II") was incorporated on September 7, 2017 in Delaware in order to receive ownership of One Cleveland Center

from Optima 1375.  According to Korf and Laber, it is owned by them (50% each), but on information and belief, it is controlled by Kolomoisky and Boholiubov.  The transfer was designed to obscure the ownership of One Cleveland Center and to further disguise the source of the funds for the building.

  i.  Optima 925 II LLC ("Optima 925 II") was incorporated on June 4, 2015 in Ohio.  Optima 925 transferred its ownership of the Huntington Building to Optima 925 II, which subsequently merged with a third-party purchaser to acquire the building.  Optima 925 II was created in order to obscure Kolomoisky and Boholiubov's ownership interest in the building.

  j.  Felman Trading Americas, Inc. was incorporated in Delaware on April 9, 2018.  According to Korf and Laber, it is owned by them (50% each), but on information and belief, it is controlled by Kolomoisky and Boholiubov.  It was created to obscure Kolomoisky and Boholiubov's ownership interest in Felman Trading Inc.

  84.  Korf and Laber used the Optima Family as a single pot of money.  They transferred funds back and forth between the different entities—that is why, for instance, Korf arranged for a manganese ore importer to pay for the restructuring of a commercial real estate building in Kentucky.  Korf discussed transfers with Kolomoisky and Boholiubov, and they approved the use of the money.

  85.  Those inter-entity loans for tens of millions of dollars occurred despite it not being the entities' business to make loans to other companies.

  86.  The transactions allowed Kolomoisky, Boholiubov, Korf, and Laber to launder money, promote the continued misappropriation of funds from PrivatBank, and disguise the ownership, nature, and source of funds.

  87.  A majority of the members of the Optima Family of companies had their principal place of business at the same suite of offices at 200 South Biscayne Boulevard in Miami, Florida.  As Korf and Laber's resources expanded, they moved from the 30th floor to the 36th and finally the 55th floor—the penthouse.

  88.  Korf and Laber played critical roles in the scheme to launder proceeds of unlawful activity.  They interacted directly with PrivatBank management, including Manager 1, Manager 2, and Manager 3 (head of the PrivatBank Credit Committee), regarding loans.  They also had personal relationships with PrivatBank's management, including Manager 1

and Manager 3. Korf and Laber requested loans for Optima Family members and received them.

89.     And Korf and Laber benefitted from their roles in the scheme. In certain cases, misappropriated funds from PrivatBank went into Korf and Laber's personal accounts. For instance, from September 2009 through April 2010, over $13 million was transferred from Optima International's account to accounts in the name of Korf, Laber, and their families. And funds from Optima International were used to pay for Korf and Laber's personal expenses.

90.     Korf and Laber took many steps to hide the identity and ownership of their "partners," and the fact that the money they spent under the Optima name had initially come from PrivatBank loans. Among other things, they (1) made quick transfers of funds among entities, which served no business purpose; (2) used misleadingly similar names of entities and changed those names with no legitimate business purpose; (3) used a convoluted ownership structure of their many entities to hide the true beneficial ownership of assets; and (4) changed the ownership structure of the Optima Family of companies as Kolomoisky and Boholiubov's crimes in Ukraine were made public.

## III.     Stemmons Towers Became Involved In The Money Laundering Scheme When Money Derived From Embezzlement And Fraud Proceeds Was Used To Improve And Maintain The Property

91.     In April 2008, Korf, Laber, Kolomoisky, and Boholiubov contracted to purchase Stemmons Towers in Dallas, Texas at 8777 and 8787 North Stemmons Freeway for $8 million. The complex includes two office towers encompassing more than 200,000 square feet of office space.

92.     To acquire the property, Korf and Laber incorporated Optima Stemmons in Delaware on May 14, 2008 and registered it in Texas on May 16, 2008. The mailing address was listed as 200 South Biscayne Boulevard, Miami, Florida, and Korf was listed as the President and Director of the company. Optima Stemmons was a wholly owned subsidiary of Optima Ventures, which also operates from 200 South Biscayne Boulevard in Miami.

93.     On May 23, 2008, Optima Stemmons completed the purchase of Stemmons Towers with approximately $7.6 million. Korf signed the paperwork associated with the purchase.

A. **The Money Used to Purchase Stemmons Towers Flowed through PrivatBank.**

94.     The funds used to purchase Stemmons Towers came from several different entities and was filtered through the bank accounts of companies associated with Kolomoisky and Boholiubov held at PrivatBank's Cyprus branch.

95.     Between May 6 and 22, 2008, approximately $10 million was transferred from outside PrivatBank into accounts at PrivatBank's Cyprus branch held in the name of Plasstex Ltd ("Plasstex") and Demeter Diversified LLC ("Demeter"). Demeter shares an address, registered agent, signer, and beneficial owner with several other entities ultimately beneficially owned by Kolomoisky, and had been used to transfer other funds misappropriated from PrivatBank for the acquisition of assets in the United States, including for the purchase of PNC Plaza.

96.     From May 7 to 23, 2008, approximately $10,076,498 was transferred from the Plasstex and Demeter accounts at PrivatBank's Cyprus branch to an account held in the name of Logarinvest Limited ("Logarinvest"), also at PrivatBank's Cyprus branch. Logarinvest is ultimately beneficially owned by Kolomoisky, and had been used to transfer other funds misappropriated from PrivatBank for the acquisition of assets in the United States, including for the purchase of PNC Plaza and the CompuCom Campus.

97.     On May 23, 2008, at 11:43 AM Miami time (6:43 PM Cyprus time), Korf sent an email to Manager 2 at PrivatBank requesting the transfer of approximately $7,624,918 to Benchmark Title Service LLC to complete the purchase of Stemmons Towers.

98.     That email initiated a series of transfers at PrivatBank's Cyprus branch just an hour and a half later. At 8:13 PM Cyprus time, $9.1 million was transferred from an account at PrivatBank's Cyprus branch held in the name of Logarinvest to an account at PrivatBank's Cyprus branch held in the name of Divot Enterprises Limited ("Divot"). Divot is ultimately beneficially owned by Kolomoisky, and had been used to transfer other funds misappropriated from PrivatBank for the acquisition of assets in the United States, including for the purchase of PNC Plaza and the CompuCom Campus.

99.     At 8:27 PM Cyprus time, $7.7 million of those funds was transferred from Divot's account to an account at PrivatBank's Cyprus branch held in the name of Grammel Holdings Inc ("Grammel"). Grammel shares an address, registered agent, and beneficial

owner with several other entities ultimately beneficially owned by Kolomoisky, and had been used to transfer other funds misappropriated from PrivatBank for the acquisition of assets in the United States, including for the purchase of 55 Public Square.

100.    One minute later, at 8:28 PM, $7,624,918 of those funds was transferred from the Grammel account to an account at PrivatBank's Cyprus branch held in the name of Ralkon Commercial Ltd ("Ralkon").  Ralkon is ultimately beneficially owned by Kolomoisky and Boholiubov, and had been used to transfer other funds misappropriated from PrivatBank for the acquisition of assets in the United States, including for the purchase of 55 Public Square.

101.    Less than ten minutes later, at 8:36 PM, the same amount, $7,624,918, was transferred from the Ralkon account to an account at PrivatBank's Cyprus branch held in the name of Pavanti.  Pavanti is ultimately beneficially owned by Kolomoisky and was routinely the final stop for funds misappropriated from PrivatBank before they were transferred to the United States to be used by Optima.

102.    At 8:43 PM, that $7,624,918 was transferred from Pavanti's account to an account at Benchmark Bank in the United States, held in the name of Benchmark Title Services, LLC, headquartered in Texas, to complete the purchase of Stemmons Towers.

103.    That pattern of rapid transfers, using various Kolomoisky and Boholiubov-controlled entities with accounts at PrivatBank's Cyprus branch, followed the pattern used to purchase other buildings in the United States, including the CompuCom Campus, PNC Plaza, and 55 Public Square, with funds misappropriated from PrivatBank.

**B.    Stemmons Towers Was Involved in and Facilitated Money Laundering Transactions.**

104.    Following the purchase of Stemmons Towers, Korf and Laber used proceeds derived from embezzlement and fraud from PrivatBank to fund the property's operating expenses, including paying for the maintenance and improvement of the property; paying off a mortgage they had taken on the property; and paying property taxes owed on the property.

*1.    Funds used by Optima Stemmons to maintain and improve Stemmons Towers came from Optima 7171 and were proceeds from the CompuCom Campus.*

105.    Between 2011 and 2018, several Optima entities transferred funds—which constituted revenues generated by buildings purchased with funds misappropriated from PrivatBank—to Optima Stemmons, which used those funds to pay for expenses related to

Stemmons Towers including property taxes, mortgage expenses, improvements, and maintenance.  Examples of those transfers include:

106.    On January 10, 2011, Optima 7171 transferred approximately $469,751 to Optima Ventures.  That same day, Optima Ventures transferred $125,000 of those funds to Optima Stemmons.  On January 18, 2011, Optima Stemmons used that money to pay a portion of an approximately $212,651 tax bill to the County of Dallas for Stemmons Towers.

107.    On January 4, 2012, Optima 7171 transferred approximately $554,046 to Optima Ventures.  On January 17, 2012, Optima Ventures transferred $180,000 of those funds to Optima Stemmons.  On January 20, 2012, Optima Stemmons used that money to pay a portion of an approximately $216,889 tax bill to the County of Dallas for Stemmons Towers.

108.    On April 2, 2013, Optima 7171 transferred approximately $558,670 to Optima Ventures.  On April 4, 2013, Optima Ventures transferred approximately $398,336, which included a portion of those funds, to Optima Stemmons.  On April 8, 2013, Optima Stemmons used that money to pay a portion of construction bills for $385,054 due to Taurus Commercial, Inc. for improvements made to Stemmons Towers.

109.    On January 5, 2015, Optima 7171 transferred approximately $676,617 to Optima Ventures.  On January 6, 2015, Optima Ventures transferred $25,000 of those funds to Optima Stemmons.  On January 12, 2015, Optima Ventures transferred an additional $61,000 to Optima Stemmons.  Over the next two weeks, Optima Stemmons used a portion of that money to pay for utility bills, maintenance, and security for Stemmons Towers.

110.    On April 2, 2015, Optima 7171 transferred approximately $680,915 to Optima Ventures.   On April 8, 2015, Optima Ventures transferred $208,000, which included a significant portion of those funds, to Optima Stemmons. On April 13, 2015, Optima Stemmons used that money to pay a portion of an approximately $243,574 tax bill to the County of Dallas for Stemmons Towers.  It used an additional portion of the funds to pay for utility bills and other expenses related to Stemmons Towers.

111.    On July 5, 2017, Optima 7171 transferred approximately $765,071 to Optima Ventures.  On July 19, 2017, Optima Ventures transferred $150,000 of those funds to Optima Stemmons.  Optima Stemmons used a portion of those funds to pay back a mortgage it had taken on Stemmons Towers.  In addition, Optima Stemmons spent approximately $20,000 of

those funds on an energy bill; approximately $16,000 to pay for the security system for the property; and approximately $10,000 on maintenance and janitorial services.

112.    On January 4, 2018, Optima 7171 transferred approximately $111,952 to Optima Ventures; in addition, on January 10, 2018, Optima 7171 transferred approximately $16,028 to Optima Ventures.  On January 18, 2018, Optima Ventures transferred a portion of the funds to Optima Stemmons.  Optima Stemmons used approximately $51,000 of the funds to pay contractors for maintenance done on Stemmons Towers.

113.    Each of those expenditures on Stemmons Towers was made with funds that were derived from criminal proceeds: the funds were derived from, and are traceable to, funds misappropriated from PrivatBank through fraud and embezzlement and subsequently laundered through commercial real estate in the United States.  The expenditure of those funds on Stemmons Towers converted Stemmons Towers into proceeds of the PrivatBank loan fraud and embezzlement scheme.

114.    Additionally, through its use as a vehicle for the reinvestment of criminal proceeds originally derived from the PrivatBank loan fraud scheme, Stemmons Towers facilitated the broader money laundering scheme.  Between October 2009 and February 2020, Optima Ventures transferred approximately $5.6 million into Optima Stemmons, and Optima Stemmons ultimately transferred approximately $6.7 million *back* to Optima Ventures.  The cyclical transfers disguised the criminal nature and source of the funds.

2.    *The funds transferred from Optima 7171 were criminal proceeds.*

115.    The funds spent by Optima Stemmons on Stemmons Towers that had come from Optima 7171 were traceable to criminal proceeds.

116.    As alleged in related case 1:20-cv-23278-MGC, Optima 7171's revenue came from the CompuCom Campus, which had been purchased with funds misappropriated from PrivatBank.  Specifically, on December 22, 2010, Optima 7171 purchased the CompuCom Campus with, among other things, a cash payment of $15,052,831.62, which had been misappropriated from PrivatBank via fraudulent loans.

117.    Approximately $8 million of those funds came from loan number 4O10091D, a line of credit for $50,000,000.  The loan application was submitted on March 28, 2010 in the name of OGZK, an entity owned by Kolomoisky and Boholiubov.  The purpose identified in the single-page loan application was "funding current operations," which were identified

as "manganese ore open-pit mining and processing."  The application stated that the "sources of funds for loan repayment" would be "funds from primary operations."

118.   A "Feasibility Study of Loan Repayment," which accompanied the application, made the same representations: the purpose of the loan was for "ongoing operational activity financing;" the "primary business activity" was "open pit mining and enrichment of manganese ore" (with "other" business activity identified as "concrete and reinforced concrete products manufacturing"); and the loan would be repaid from "revenue generated by the company."

119.   Section 2.2.1 of the Loan Agreement required that the borrower, OGZK, "[u]se the loan for the purposes set forth" in the Loan Agreement, which was stated as "funding regular operations" of the "Mining and Processing Plant."

120.   On March 30, 2010, only two days after the loan application was submitted, PrivatBank's electronic Credit Committee approved the $50 million loan.   The Loan Agreement was signed on April 1.

121.   The representations made in the application, feasibility study, and Loan Agreement were false.  First, the documents misrepresented the purpose of the loan.  Rather than the money being used by OGZK for its "primary activity" of manganese extraction and refinement in Ukraine, $8 million of the loan funds were used by Optima 7171, a completely unrelated entity, to buy commercial real estate in the United States.  The funds were sent from PrivatBank through a network of accounts at PrivatBank's Cyprus branch in a series of six transactions over two days before being used to purchase the CompuCom Campus.

122.   Additionally, the documents misrepresented the source of repayment for the loan.  Contrary to representations in the loan documents, the loan was not repaid solely using OGZK's current assets or revenue from its business activities.  Instead, portions of that loan were repaid with additional loans from PrivatBank.  During the life of the line of credit (between April 2010 and February 2011), OGZK debited over $109 million against the line of credit; more than $44 million of the funds used to repay that loan came from the proceeds of more than a dozen other loans issued by PrivatBank.  Thus, rather than OGZK paying PrivatBank with funds derived from its business activities—as it represented that it would in the loan application and Loan Agreement—the bank's own money was moved from one pocket to another to disguise the hole in the bank's books.

123.     Additional funds came from two loans to NZF.  Loan numbers 4N10223D and 4N10224D were both lines of credit issued on September 1, 2010 by PrivatBank to NZF for $14 million each.  The stated purpose of each loan was financing current operations of NZF, and the loan agreements required that the loan funds be used for the intended purpose of the loan.  NZF's "operations" consisted of ferroalloy processing.  As with the loan to OGZK, the loans to NZF included material falsehoods—critically, the loan funds were not used for NZF's operations and ferroalloy production.  Instead, the funds were transferred through numerous other entities, as described below, before being used to purchase the CompuCom Campus.

124.     The remainder of the funds used to complete the CompuCom Campus acquisition came from other loans issued by PrivatBank to entities owned and controlled by Kolomoisky and Boholiubov, including three additional loans issued to NZF; loan numbers 4Z10340D and 4Z10339D, issued to ZFZ on December 1, 2010; and loan number CY001K/2, issued to Glowston Products Ltd. ("Glowston") on December 15, 2010.

125.     Like OGZK, the entities that applied for those additional loans were companies with ferroalloy and mining operations.  None of them was in the business of purchasing commercial real estate in the United States.  Nevertheless, the loan funds that PrivatBank distributed to metal and mining companies in Ukraine were diverted to the United States, where they were ultimately used to purchase the CompuCom Campus.

126.     Before being used to purchase the CompuCom Campus, the proceeds from the loans issued by PrivatBank were combined, divided, and transferred through multiple companies' bank accounts in a matter of days to hide their source and nature as misappropriated funds.

127.     Between December 13 and 17, 2010, millions of dollars of the loan proceeds from loan numbers 4N10223D, 4N10224D, CY001K/2, 4Z10340D, and 4Z10339D, as well as three other loans to NZF, were transferred through accounts at PrivatBank's Cyprus branch held in the name of Divot, Logarinvest, Albroath International Corp, Chemstar Products LLC, Arran Continental SA, and Garstang Financial Inc., all of which were Kolomoisky and Boholiubov-owned and -controlled entities.  On December 17, 2010, between 4:30 and 4:38 PM Cyprus time, the loan proceeds were combined and amalgamated in an account at PrivatBank's Cyprus branch held in the name of Brimmilton Limited ("Brimmilton"), which

was also owned and controlled by Kolomoisky and Boholiubov.  Immediately after those transfers, at 4:38 PM, $8 million of the funds was transferred to an account at PrivatBank's Cyprus branch held in the name of Hetterington Group Ltd ("Hetterington"), another Kolomoisky- and Boholiubov-owned entity.

128.   On December 21, 2010, at 5:40 PM Cyprus time, PrivatBank disbursed $25 million from the revolving line of credit it granted to OGZK (loan number 4O10091D).  Those funds were transferred from a loan account at PrivatBank Ukraine held in the name of OGZK into an account at PrivatBank's Cyprus branch held in the name of Halefield.

129.   At 7:10 PM Cyprus time that same day, the funds were rapidly transferred to yet more accounts held at PrivatBank's Cyprus branch.  First, Halefield transferred the $25 million to Brimmilton's account; then, immediately upon receipt, Brimmilton transferred $8 million of the funds to Hetterington's account; then, those funds were combined with the proceeds from the other loans issued by PrivatBank.

130.   On December 22, 2010, at 7:51 PM Cyprus time, $17 million was transferred out of Hetterington's account to an account at PrivatBank's Cyprus branch held in the name of Carnton Commercial Ltd.  Of the approximately $17 million, approximately $7.7 million was attributable to the NZF, ZFZ, and Glowston loans, and approximately $6.6 million came from the loan to OGZK.  Of the approximately $17 million, $15.2 million was transferred only three minutes later into an account at Privat's Cyprus branch held in the name of Albroath.  At 7:55 PM, $15,176,000 of those funds was deposited into Pavanti's account at PrivatBank's Cyprus branch.

131.   At 8:31 PM, Pavanti transferred $15,175,306 of those funds to an account held at Regions Bank in the United States in the name of Optima Ventures.  The memo line for the transfer read: "For OPTIMA VENTURES LLC 0077605470 FOR COMPUCOM WORLD HEADQUARTERS CAMPUS ACQUISITION. AS PER LOAN AGREEMENT DD 21.12.2010."  Prior to that transfer, Optima Ventures' account had a beginning balance on December 22, 2010 of less than $70,000.

132.   The same day the funds were transferred into Optima Ventures' account, Optima Ventures sent the same amount, $15,175,306, to First American Title Insurance Company.

133.    Thus, on December 22, 2010, funds that PrivatBank provided to Ukrainian and other entities, ostensibly for the purpose of funding ongoing operations of Ukrainian ferroalloy and mining plants, were instead used to purchase the CompuCom Campus in Dallas, Texas for a United States entity, Optima 7171, which had no formal relationship with the Ukrainian entities.

134.    Kolomoisky and Boholiubov's applications for, receipt of, and use of the proceeds of loans constituted embezzlement and conversion of PrivatBank's money.  They also constituted a fraud by and on PrivatBank.  The transfers of the funds from Cyprus to the United States were transfers in foreign commerce and constituted money laundering.  The transfer of funds that effectuated the purchase of the CompuCom Campus also constituted both money laundering and a transfer and receipt of stolen funds in foreign commerce.

135.    The numerous intermediate transfers of the proceeds of the embezzlement and fraud served no legitimate business purpose.  They were designed to conceal and disguise the nature, location, source, ownership, and control of the fraudulently obtained loan proceeds.

136.    Each quarter following the acquisition of the CompuCom Campus in December 2010, CompuCom, which leased the property, paid Optima 7171 roughly $1.3 million in rent for its use of the property.  From January 2011 to February 2018, CompuCom paid approximately $45 million to Optima 7171.  In that same period, Optima 7171 transferred approximately $17 million to Optima Ventures, a portion of which was transferred to Optima Stemmons to fund the maintenance, operations, property tax payments, and related expenses of Stemmons Towers, as described above.

137.    Because the CompuCom Campus was purchased with criminal proceeds, the rental income it generated is derived from proceeds.  Thus, all funds transferred from Optima 7171 to Optima Stemmons (via Optima Ventures) were proceeds of the scheme to embezzle from and defraud PrivatBank, and the use of these funds to finance the expenses of Stemmons Towers converted Stemmons Towers into proceeds as well, and allowed it to facilitate and be involved in the money laundering scheme.

C.    **Stemmons Towers Was Used as Collateral to Secure a Loan.**

138.    In April 2017, Stemmons Towers (along with 55 Public Square) was used as collateral to secure a loan of $10 million from The Battery Group LLC, specifically from TBG Funding LLC ("TBG").  The loan agreement included an assignment of rents from Stemmons

Towers to TBG.  The loan funds were sent to Optima Ventures on April 24, 2017.  The next day, they were transferred to Optima Acquisitions, LLC.  From there, they were sent to Optima Specialty Steel.

139.     The TBG loan was paid back with proceeds obtained through yet another loan, taken out by a different Optima entity.  In November 2017, Optima 55 Public Square and Optima 1375 obtained a loan for $8.5 million from 55 Bridge Lending LLC ("55 Bridge Lending").  In May 2018, Optima 55 Public Square increased its borrowing from 55 Bridge Lending to $18.5 million.  A portion of those funds was used to repay the TBG loan.

140.     The use of Stemmons Towers as collateral to secure loans further laundered and facilitated the laundering of the misappropriated funds from PrivatBank.

**D.     Optima Stemmons Transferred Funds to Promote the Misappropriation from PrivatBank.**

141.     On September 30, 2016, Optima Stemmons transferred $290,000 to an account held in the name of Optima Ventures.  The funds were then commingled with funds transferred from other Optima entities, including Optima 55 Public Square and Optima 500. That same day, $1.5 million of commingled funds was sent to an account at PrivatBank's Cyprus branch held in the name of Pavanti.  Between December 5 and December 13, 2016, the $1.5 million was used in a series of transactions for the benefit of Kolomoisky. Specifically, on December 5 and 6, 2016, a total of $1.2 million ($600,000 on each date) of the $1.5 million was transferred to and through various accounts at PrivatBank's Cyprus branch in the names of entities owned or controlled by Kolomoisky, including Divot, Selantia Ltd, and Kolomoisky's own personal account.  The $1.2 million ultimately was transferred outside PrivatBank to a Swiss bank account in the name of Southbay Enterprises Limited. Additionally, on December 13, 2016, only five days before PrivatBank was nationalized approximately $73,000 of the funds was transferred to the personal account of Kolomoisky, held at PrivatBank's Cyprus branch.

**E.     Optima's Sale of Stemmons Towers Further Laundered the Funds Misappropriated from PrivatBank.**

142.     Beginning in approximately June 2015, Korf, Laber, Kolomoisky, and Boholiubov began a mass selloff of the assets they had purchased in the United States.  In short order, they sold the Huntington Building (2015); the Harvard Motorola Facility (2016); the AECOM Building (2018); PNC Plaza (under contract, 2020); 55 Public Square (under

contract, 2020); and the CompuCom Campus (2021, though it had been on the market prior to the filing of the civil forfeiture complaint in that action).

143.    Among the properties they offloaded was Stemmons Towers, which Optima Stemmons had listed for sale in 2018, and ultimately sold to 8787 Ricchi LLC for $6.5 million in 2019.  The sale included a cash transfer from the buyer of approximately $742,000.  After a portion of those funds was used to pay various closing costs, the remainder, $318,027.92, was wired to Optima Stemmons on December 20, 2019.  Over the next month, $298,500 of those sale proceeds was transferred from Optima Stemmons to Optima Ventures, which in turn sent nearly all of those funds to Optima 55 Public Square.

144.    The balance of the purchase price, $5.7 million, was not paid by the buyer at the time of sale; instead, it was financed by Optima Stemmons.  Because the building had insufficient occupancy and rental income to make it financially attractive, Optima Stemmons agreed to provide the financing as an inducement to close the sale.

145.    On December 19, 2019, 8787 Ricchi executed the Promissory Note evidencing the loan.  The Note required that 8787 Ricchi make interest payments for the first five years of the agreement, at which time the principal would come due.  The interest rate was set at 5% per year, or $23,750 per month, though payments were partially deferred during an initial 18-month discount period.

146.    The Promissory Note provided that payments be made to the benefit of an entity called 87STE Lending LLC.  Optima Ventures had created the entity specifically for the purpose of receiving the payments on the Note.  It was wholly owned by Optima Ventures and was incorporated in Delaware on December 17, 2019, just two days prior to the execution of the Promissory Note.

147.    Simultaneously, 8787 Ricchi executed a Deed of Trust, Security Agreement, Assignment of Leases and Rents, and Fixture Filing ("Deed of Trust") securing the Note.  It named Optima Stemmons as the Trustee and 87STE Lending as the Lender.  The Deed of Trust granted a security interest in Stemmons Towers, as well as rents and leases on the property, to 87STE Lending, with Optima Stemmons serving as the Trustee.  The Deed of Trust was recorded on December 23, 2019 in Dallas, Texas.

148.    The effect of this financing mechanism was to create a sort of installment contract or deferred payment for the property.  Rather than the purchase price being due

immediately, Optima effectively would recover the $5.7 million 5 years later, with interest in the interim.

149.    On information and belief, 87STE Lending never opened a bank account or even had its own tax identification number—and it never actually transferred any money to Optima Stemmons as part of the sale.  Instead, balance sheet manipulation made it seem like money "moved" among Optima Ventures, 87STE Lending, and Optima Stemmons.  And so, while 87STE Lending is, on paper, owed funds under the Note, in practice, no money ever changed hands among the Optima entities, and any payments made on the Note are effectively to Optima Ventures.  Since the sale, the buyer was directed to make the payments due under the Note to various accounts, none of which belonged to 87STE Lending.

150.    Under the Promissory Note, the buyer of Stemmons Towers still owes $5.7 million in principal, plus interest.  It has been making ongoing payments of interest per the agreement.  The financing scheme transformed the value of the building into the Promissory Note secured by the Deed of Trust, which together represent the proceeds of the misappropriation from PrivatBank, and were involved in and facilitated a further money laundering transaction.

## FIRST CLAIM FOR RELIEF
### 18 U.S.C. § 981(a)(1)(C)

151.    Paragraphs 1 through 150 above are incorporated by reference as if fully set forth herein.

152.    The Defendant Asset is property that constitutes, or is derived from, proceeds traceable to (i) a foreign offense involving fraud, or a scheme or attempt to defraud, by or against a foreign bank (18 U.S.C. § 1956(c)(7)(B)(iii)); (ii) the international transportation and transfer of stolen, converted, or fraudulently obtained money or property valued over $5,000 (18 U.S.C. § 2314); and (iii) the receipt, possession, concealment, storage, sale, and disposal of stolen, converted, or fraudulently obtained money or property valued over $5,000 that traveled from outside the United States into and among the United States (18 U.S.C. § 2315), all of which are specified unlawful activities under 18 U.S.C. §§ 1956(c)(7)(A) and 1956(c)(7)(B)(iii), or a conspiracy to commit such offenses.

153.    Accordingly, the Defendant Asset is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C).

## SECOND CLAIM FOR RELIEF

18 U.S.C. § 981(a)(1)(A)

154.    Paragraphs 1 through 150 above are incorporated by reference as if fully set forth herein.

155.    The Defendant Asset is involved in, or is traceable to property involved in, one or more transactions or attempted transactions in violation of 18 U.S.C. § 1957.  Specifically, the Defendant Asset is involved in or is traceable to monetary transactions in criminally derived property of a value greater than $10,000, that is a foreign offense involving fraud, or a scheme or attempt to defraud, by or against a foreign bank (18 U.S.C. § 1956(c)(7)(B)(iii)); the international transportation and transfer of stolen, converted, or fraudulently obtained money or property (18 U.S.C. § 2314); and the receipt, possession, concealment, storage, sale, and disposal of stolen, converted, or fraudulently obtained money or property valued over $5,000 that traveled from outside the United States into and among the United States (18 U.S.C. § 2315).

156.    Accordingly, the Defendant Asset is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A).

## THIRD CLAIM FOR RELIEF

18 U.S.C. § 981(a)(1)(A)

157.    Paragraphs 1 through 150 above are incorporated by reference as if fully set forth herein.

158.    The Defendant Asset is involved in, or is traceable to property involved in, one or more transactions or attempted transactions in violation of 18 U.S.C. § 1956(a)(1)(A)(i). Specifically, the Defendant Asset is involved in or traceable to financial transactions involving the proceeds of specified unlawful activities, that is a foreign offense involving fraud, or a scheme or attempt to defraud, by or against a foreign bank (18 U.S.C. § 1956(c)(7)(B)(iii)); the international transportation and transfer of stolen, converted, or fraudulently obtained money or property (18 U.S.C. § 2314); and the receipt, possession, concealment, storage, sale, and disposal of stolen, converted, or fraudulently obtained money or property valued over $5,000 that traveled from outside the United States into and among the United States (18 U.S.C. § 2315), and with the intent to promote the carrying on of the specified unlawful activities in violation of 18 U.S.C. § 1956(a)(1)(A)(i).

159.    Accordingly, the Defendant Asset is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A).

## FOURTH CLAIM FOR RELIEF

### 18 U.S.C. § 981(a)(1)(A)

160.    Paragraphs 1 through 150 above are incorporated by reference as if fully set forth herein.

161.    The Defendant Asset is involved in, or is traceable to property involved in, one or more transactions or attempted transactions in violation of 18 U.S.C. § 1956(a)(1)(B)(i). Specifically, the Defendant Asset is involved in or traceable to financial transactions involving the proceeds of specified unlawful activities, that is a foreign offense involving fraud, or a scheme or attempt to defraud, by or against a foreign bank (18 U.S.C. § 1956(c)(7)(B)(iii)); the international transportation and transfer of stolen, converted, or fraudulently obtained money or property (18 U.S.C. § 2314); and the receipt, possession, concealment, storage, sale, and disposal of stolen, converted, or fraudulently obtained money or property valued over $5,000 that traveled from outside the United States into and among the United States (18 U.S.C. § 2315), and which was designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of the specified unlawful activities in violation of 18 U.S.C. § 1956(a)(1)(B)(i).

162.    Accordingly, the Defendant Asset is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A).

## FIFTH CLAIM FOR RELIEF

### 18 U.S.C. § 981(a)(1)(A)

163.    Paragraphs 1 through 150 above are incorporated by reference as if fully set forth herein.

164.    The Defendant Asset is involved in, or is traceable to property involved in, one or more transactions or attempted transactions in violation of 18 U.S.C. § 1956(a)(2)(A). Specifically, the Defendant Asset was, or is traceable to funds that were, transported, transmitted, or transferred to a place in the United States from or through a place outside the United States with the intent to promote the carrying on of the specified unlawful activities, that is a foreign offense involving fraud, or a scheme or attempt to defraud, by or against a foreign bank (18 U.S.C. § 1956(c)(7)(B)(iii)); the international transportation and transfer of

stolen, converted, or fraudulently obtained money or property (18 U.S.C. § 2314); and the receipt, possession, concealment, storage, sale, and disposal of stolen, converted, or fraudulently obtained money or property valued over $5,000 that traveled from outside the United States into and among the United States (18 U.S.C. § 2315).

165.    Accordingly, the Defendant Asset is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A).

## SIXTH CLAIM FOR RELIEF
### 18 U.S.C. § 981(a)(1)(A)

166.    Paragraphs 1 through 150 above are incorporated by reference as if fully set forth herein.

167.    The Defendant Asset is involved in, or is traceable to property involved in, one or more transactions or attempted transactions in violation of 18 U.S.C. § 1956(a)(2)(B)(i). Specifically, the Defendant Asset was, or is traceable to funds that were, transported, transmitted, or transferred to a place in the United States from or through a place outside the United States, knowing that the funds involved in the transportation, transmission, or transfer represent the proceeds of some form of unlawful activity and knowing that such transportation, transmission, or transfer is designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activities, that is a foreign offense involving fraud, or a scheme or attempt to defraud, by or against a foreign bank (18 U.S.C. § 1956(c)(7)(B)(iii)); the international transportation and transfer of stolen, converted, or fraudulently obtained money or property (18 U.S.C. § 2314); and the receipt, possession, concealment, storage, sale, and disposal of stolen, converted, or fraudulently obtained money or property valued over $5,000 that traveled from outside the United States into and among the United States (18 U.S.C. § 2315).

168.    Accordingly, the Defendant Asset is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A).

## SEVENTH CLAIM FOR RELIEF
### 18 U.S.C. § 981(a)(1)(A)

169.    Paragraphs 1 through 150 above are incorporated by reference as if fully set forth herein.

170.    The Defendant Asset is involved in, or is traceable to property involved in, a conspiracy to launder the proceeds of specified unlawful activities in violation of 18 U.S.C. § 1956(h).

171.    Specifically, the Defendant Asset is involved in, or is traceable to funds that were involved in, a conspiracy:

a.    To engage or attempt to engage in monetary transactions in criminally derived property of a value greater than $10,000, such property having been derived from specified unlawful activities, that is a foreign offense involving fraud, or a scheme or attempt to defraud, by or against a foreign bank (18 U.S.C. § 1956(c)(7)(B)(iii)); the international transportation and transfer of stolen, converted, or fraudulently obtained money or property (18 U.S.C. § 2314); and the receipt, possession, concealment, storage, sale, and disposal of stolen, converted, or fraudulently obtained money or property valued over $5,000 that traveled from outside the United States into and among the United States (18 U.S.C. § 2315), in violation of 18 U.S.C. § 1957;

b.    To conduct or attempt to conduct financial transactions which involve the proceeds of specified unlawful activities, that is a foreign offense involving fraud, or a scheme or attempt to defraud, by or against a foreign bank (18 U.S.C. § 1956(c)(7)(B)(iii)); the international transportation and transfer of stolen, converted, or fraudulently obtained money or property (18 U.S.C. § 2314); and the receipt, possession, concealment, storage, sale, and disposal of stolen, converted, or fraudulently obtained money or property valued over $5,000 that traveled from outside the United States into and among the United States (18 U.S.C. § 2315), and with the intent to promote the carrying on of the specified unlawful activities in violation of 18 U.S.C. § 1956(a)(1)(A)(i);

c.    To conduct or attempt to conduct financial transactions which involve the proceeds of specified unlawful activities, that is a foreign offense involving fraud, or a scheme or attempt to defraud, by or against a foreign bank (18 U.S.C. § 1956(c)(7)(B)(iii)); the international transportation and transfer of stolen, converted, or fraudulently obtained money or property (18 U.S.C. § 2314); and the receipt, possession, concealment, storage, sale, and disposal of stolen, converted, or fraudulently obtained money or property valued over $5,000 that traveled from outside

the United States into and among the United States (18 U.S.C. § 2315), and which was designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of the specified unlawful activities in violation of 18 U.S.C. § 1956(a)(1)(B)(i);

      d.     To conduct or attempt to conduct financial transactions which involve the proceeds of specified unlawful activities with the intent to promote the carrying on of the specified unlawful activities, that is a foreign offense involving fraud, or a scheme or attempt to defraud, by or against a foreign bank (18 U.S.C. § 1956(c)(7)(B)(iii)); the international transportation and transfer of stolen, converted, or fraudulently obtained money or property (18 U.S.C. § 2314); and the receipt, possession, concealment, storage, sale, and disposal of stolen, converted, or fraudulently obtained money or property valued over $5,000 that traveled from outside the United States into and among the United States (18 U.S.C. § 2315) in violation of 18 U.S.C. § 1956(a)(2)(A).

      e.     To transport, transmit, or transfer to a place in the United States from or through a place outside the United States, knowing that such transportation, transmission, or transfer is designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activities, that is a foreign offense involving fraud, or a scheme or attempt to defraud, by or against a foreign bank (18 U.S.C. § 1956(c)(7)(B)(iii)); the international transportation and transfer of stolen, converted, or fraudulently obtained money or property (18 U.S.C. § 2314); and the receipt, possession, concealment, storage, sale, and disposal of stolen, converted, or fraudulently obtained money or property valued over $5,000 that traveled from outside the United States into and among the United States (18 U.S.C. § 2315), in violation of 18 U.S.C. § 1956(a)(2)(B)(i).

172.    Accordingly, the Defendant Asset is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A).

WHEREFORE, Plaintiff, the United States of America, requests:

1. The Defendant Asset be proceeded against according to the law and the rules of this Court, and that due notice be given to all the interested parties to appear and show cause why forfeiture should not be decreed.

2. The Court, for the reasons set forth herein, adjudge and decree that the Defendant Asset be forfeited to the United States of America and disposed of in accordance with existing laws, together with costs, and for such other relief as this Court deems proper and just.

## DEMAND FOR JURY TRIAL

The United States hereby demands a trial by jury as to all issues so triable.

Respectfully submitted,

January 20, 2022

DEBORAH CONNOR, CHIEF
MONEY LAUNDERING & ASSET RECOVERY
   SECTION

By:   */s/ Shai D. Bronshtein*
Mary K. Butler, Chief, International Unit
Shai D. Bronshtein (ID No. A5502665)
Rachel E. Goldstein
Trial Attorneys
Criminal Division
United States Department of Justice
1400 New York Avenue NW
Washington, DC 20005
Telephone: (202) 616-5950
Shai.Bronshtein@usdoj.gov

*Attorneys for Plaintiff United States of America*

## **VERIFICATION**

Matthew M. Hoke, being of legal age, verifies, and pursuant to 28 U.S.C. § 1746(2), declares and states as follows:

1.       I am a supervisory special agent with the FBI and am assigned to the investigation in this case.

2.       I have reviewed the foregoing Verified Complaint for Forfeiture *in Rem* and know the contents thereof and that the matters contained in the Verified Complaint are true to my own knowledge, except that those matters herein stated to be alleged on information and belief and, as to those matters, I believe them to be true.

3.       The sources of my knowledge and information and the grounds of my belief are the official files and records of the United States, publicly available files and historical information, information supplied to me by other law enforcement officers, experts, and other witnesses, as well as my investigation of this case, together with others, as a special agent.

I hereby declare under penalty of perjury that the foregoing is true and correct.

Executed on January 19, 2022.

Matthew M. Hoke
Supervisory Special Agent